**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| TANK HOLDINGS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:12-CV-713 JAR |
| | ) | |
| BRIAN BELL, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM AND ORDER**

Now before the court are: (1) Plaintiff Tank Holdings, Inc.'s[1] Motion to Stay

Counterclaim Pending Arbitration (ECF 68); and (2) the Joint Motion for Summary Judgment

(ECF 73) filed by Defendants Brian K. Bell ("Defendant B. Bell") and Scarlett M. Bell

("Defendant S. Bell"), individually and as Trustees for The Brian Keith Bell and Scarlett

Morgana Bell Revocable Living Trust Dated June 22, 2007 ("Defendant Bell Trust")

(collectively, "Bell Defendants"),[2] and Defendants Chris Slinkard ("Defendant C. Slinkard") and

Shawnna Slinkard ("Defendant S. Slinkard") (collectively, "Slinkard Defendants").   Both

matters are fully briefed and ready for disposition.  For the reasons stated below, the motion to

stay counterclaim will be GRANTED in part and DENIED in part, and the motion for summary

judgment will be DENIED.

**I. BACKGROUND**

Prior to December of 2010, the Bell Defendants owned Bell Ventures, LLC ("Bell

Ventures"), which in turn was sole owner of USA Tank, M&W Tank Construction Co., Total

---

[1] Plaintiff may also be referred to as the "Buyer" in the parties' contract or by Plaintiff's experts.
[2] The Bell Defendants may also be referred to as the "Seller" or "Seller Parties" in the parties' contract or by
Plaintiff's experts.

Tanks, LLC, and Deep Creek Engineering, LLC (collectively, "USA Tank").[3]   The Slinkard Defendants were each employed by USA Tank.   On September 15, 2010, Plaintiff offered to purchase USA Tank from the Bell Defendants.   Between September 2010 and December 20, 2010, Plaintiff and the Bell Defendants performed due diligence and negotiated a Securities Purchase Agreement ("SPA") for the purchase of USA Tank.   On December 20, 2010, the Bell Defendants and Plaintiff closed on the SPA.

Plaintiff initiated the instant action by filing a Complaint (ECF 1) in this Court on April 20, 2012, and on June 15, 2012, Plaintiff filed a First Amended Complaint (ECF 33).   In its First Amended Complaint, Plaintiff alleges that prior to the sale of USA Tank, Defendants provided Plaintiff with financial statements that contained misrepresentations and omissions that inflated its profits and its earnings before interest, taxes, depreciation, and amortization ("EBITDA"), thereby inducing Plaintiff to overpay substantially for USA Tank.   Plaintiff asserts the following causes of action: (1) breach of representations and warranties contained in the agreement asserted against the Bell Defendants; (2) breach of the indemnity provisions contained in the agreement asserted against the Bell Defendants; (3) violation of Rule 10b-5 of the Securities Exchange Act of 1934[4] asserted against all Defendants; (4) violation of the Missouri Uniform Securities Act, § 409.5-501 et seq., asserted against all Defendants; (5) common law fraud asserted against all Defendants; (6) negligent misrepresentation asserted against all Defendants; (7) civil conspiracy asserted against all Defendants; (8) breach of fiduciary duty asserted against

---

[3] Bell Ventures and its subsidiaries may also be referred to as the "Acquired Companies" or the "Company" in the parties' contract or by Plaintiff's experts.

[4] Securities and Exchange Commission Rule 10b-5 implements § 10b of the Securities Exchange Act of 1934 by making it unlawful to, among other things, "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b–5(b); see Matrixx Initiatives, Inc. v. Siracusano, -- U.S. --, 131 S. Ct. 1309, 1317 (2011).

Defendants B. Bell and C. Slinkard; and (9) indemnification asserted against Defendant C. Slinkard.  (See ECF 33.)

On May 18, 2012, the Bell Defendants filed a Counterclaim (ECF 22) against Plaintiff for breach of contract, injunctive relief, and declaratory judgment.  The Bell Defendants allege that Plaintiff failed, as required by the SPA, to conduct the business of USA Tank in good faith and to operate such business in the ordinary course of business.  The Bell Defendants allege that, because of Plaintiff's failure, they have been denied performance payouts and the return of an amount deposited into an escrow account.

## II. SUMMARY JUDGMENT

### A.      Standard of Review

The Court shall grant a motion for summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); see Fed. R. Civ. P. 56; Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011).  The substantive law determines which facts are critical and which are irrelevant.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  Only disputes over facts that might affect the outcome will properly preclude summary judgment.  Id.  Summary judgment is not proper if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  Id.

A moving party always bears the burden of informing the Court of the basis of its motion. Celotex Corp., 477 U.S. at 323.  Once the moving party discharges this burden, the nonmoving party must set forth specific facts demonstrating that there is a dispute as to a genuine issue of material fact, not the "mere existence of some alleged factual dispute."  Anderson, 477 U.S. at

247.  The nonmoving party may not rest upon mere allegations or denials of its pleading.  Id. at

248-49.

In passing on a motion for summary judgment, the Court must view the facts in the light

most favorable to the nonmoving party, and all justifiable inferences are to be drawn in its favor.

Torgerson, 643 F.3d at 1042.  The Court's function is not to weigh the evidence but to determine

whether there is a genuine issue for trial.    Anderson, 477 U.S. at 249. "'Credibility

determinations, the weighing of the evidence, and the drawing of legitimate inferences from the

facts are jury functions, not those of a judge.'"  Torgerson, 643 F.3d at 1042 (quoting Reeves v.

Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000)).

**B.      Facts**

> **1.      Undisputed Facts**

The following facts are either specifically agreed upon or not sufficiently controverted

pursuant to E.D.Mo. L.R. 4.01(E), and are therefore accepted as true for purposes of this motion.

Prior to December 20, 2010, the Bell Defendants were the owners of 100% of the outstanding

capital stock of Bell Ventures.  (Defendants' Joint Statement of Uncontroverted Material Facts in

Support of Summary Judgment, ECF 101, ¶1.)  Prior to December 20, 2010, Bell Ventures was

the sole owner of USA Tank.  (Id., ¶2.)  Prior to December 20, 2010, Defendant C. Slinkard was

the General Manager for USA Tank and Defendant S. Slinkard was the Controller, Secretary,

and Treasurer for USA Tank.  (Id., ¶¶3-4.)

Historically, USA Tank was a storage tank sale and construction company that sold and

installed commercial bolted-steel storage tanks.  (Id., ¶5.)  In approximately 2009, USA Tank

began working on "turnkey projects" that incorporated commercial storage tanks, such as water

treatment and sand processing facilities.  (Id., ¶6.)  One of the turnkey projects included the

- 4 -

design and construction of a sand processing facility in Cadre, Texas ("Cadre Project").  (Id., ¶7.)
The Cadre Project was an ongoing project during the time relevant to this action.

On April 6, 2010, Plaintiff offered to purchase USA Tank from the Bell Defendants for
$24 million, subject to many additional terms and conditions, including a $4 million hold-back
that would be paid in the event that USA Tank reached certain financial targets in 2011.  (Id.,
¶10.)  The Bell Defendants rejected Plaintiff's April 6, 2010 offer and thereafter entered into
negotiations with a different potential buyer.  (Id., ¶11.)

The parties then resumed negotiations and agreed to meet on September 13, 2010 to
discuss USA Tank's financial projections.  (Plaintiff's Statement of Additional Material Facts in
Response to Defendants' Joint Motion for Summary Judgment, ECF 115, ¶8.)  At the September
13, 2010 meeting, Defendants provided Plaintiff with a PowerPoint presentation that included
financial information about USA Tank.  (Id., ¶9.)

On September 15, 2010, Plaintiff offered to purchase USA Tank from the Bell
Defendants for $28 million, subject to many additional terms and conditions, including certain
adjustments and a $4 million hold-back that would be paid in the event that USA Tank reached
certain financial targets in 2011.  (ECF 101, ¶12.)  Between September 2010 and December 20,
2010, Plaintiff and the Bell Defendants performed due diligence and negotiated the SPA for the
purchase of USA Tank.  (Id., ¶13.)  RSM McGladrey acted as Plaintiff's due diligence advisors
during this period.  (Id., ¶29.)  As part of the due diligence process, Defendants delivered to
Plaintiff interim financial statements that provided USA Tank financial information for fiscal
year 2010, up to and through September 30, 2010.  (Id., ¶14.)

The SPA, which closed on December 20, 2010 ("Closing Date") (Id., ¶15), reflected a
base purchase price of $24,000,000.00, "minus (i) the Seller Expenses, minus (ii) the Closing

Repaid Indebtedness, plus or minus (iii) the Estimated Cash Amount, determined in accordance

with Section 2.5(B), and minus (iv) to the extent that the Estimated Project Margin Position is

less than zero, the Estimated Project Margin Position . . . ."  (SPA, ECF 117 at 18.)  Section 2.5,

which concerned certain base purchase price adjustments, stated as follows:

> (A) Estimated Project Margin Position.  Immediately prior to the Closing Date,
> the Company shall prepare and deliver . . . to the Buyer its reasonable good faith
> estimate of the Project Margin Position of the Acquired Companies for each of
> the construction projects set forth on Schedule 2.5(a)(1) . . . as of the Closing
> Date. . . .  The Base Purchase Price shall be decreased dollar for dollar by the
> amount that the aggregate Estimated Project Margin Position for all Projects is
> less than zero.
>
> (B) Estimated Cash Amount.  Immediately prior to the Closing Date, the
> Company shall prepare and deliver . . . to the Buyer its reasonable good faith
> estimate of the Cash Amount of the Acquired Companies as of the Closing Date .
> . . .  The Base Purchase Price shall be increased dollar for dollar by the amount
> the Estimated Cash Amount is greater than zero, or, as applicable, decreased
> dollar for dollar by the amount the Estimate [sic] Cash Amount is less than zero.

(Id. at 21.)  The subsequent section, § 2.6, concerned Interim Payments, and stated as follows:

> Interim Payments.  To the extent that the aggregate Estimated Project Margin
> Position for all Projects as of the Closing Date is positive, then Buyer shall pay . .
> . to [the Bell Trust], on a Project-by-Project basis, any cash payments received
> with respect to Projects which had a positive Estimated Project Margin Position as
> of the Closing Date . . .; provided, however, that the total amount of Interim
> Payments payable to [the Bell Trust] shall not exceed the positive amount of the
> aggregate Estimated Project Margin Position for all Projects as of the Closing
> Date.

(Id. at 21-22.)

Section 2.7 of the SPA required the Bell Defendants, at the closing, to provide Plaintiff

with an estimate of the profit margins earned on approximately seventy-eight jobs in progress

("Estimated Profit Margins").  (ECF 101, ¶55.)  This section also required Plaintiff, after closing,

to calculate the actual profit margin earned for each job as they were competed ("Actual Profit

Margins.")  (Id., ¶57.)  Under this section of the SPA, if the Actual Profit Margins were greater

than the Estimated Profit Margins, then Plaintiff would owe the Bell Defendants the difference; however, if the Actual Profit Margins were less than the Estimated Profit Margins, then the Bell Defendants would owe Plaintiff the difference.  (Id., ¶¶58-59.)  Section 2.8 of the SPA provided that Plaintiff was to provide the Bell Defendants with a 2011 income report that stated USA Tank's EBITDA for fiscal year 2011 ("2011 EBITDA").  (Id., ¶¶63-64.)  If the 2011 EBITDA exceeded $8 million, then the Bell Defendants would receive an Earn-Out payment of $4 million; if the 2011 EBITDA was between $7.25 and $8 million, the Bell Defendants would receive a partial Earn-Out payment of $3 million; if the 2011 EBITDA was between $6.5 and $7.249,000, the Bell Defendants would receive a partial Earn-Out payment of $1.5 million; and if the 2011 EBITDA was less than $6.5 million, the Bell Defendants would receive no Earn-Out payment.  (Id., ¶65.)

The SPA also contained several sections regarding the representations and warranties of the Bell Defendants.  Section 3.4 concerned financial statements, and stated as follows:

> Seller Parties have delivered to Buyer: (A) audited consolidated balance sheets of the Acquired Companies as of December 31 in each of the years 2007 through 2009 . . . and the related audited consolidated statements of income, changes in stockholders' equity, and cash flow for each of the fiscal years then ended . . . and (B) an unaudited consolidated balance sheet of the Acquired Companies as of September 30, 2010 . . . and the related unaudited consolidated statements of income, changes in stockholders' equity, and cash flow for the nine months then ended, including in each case the notes thereto.  Such financial statements and notes (1) fairly present the financial condition and the results of operations, changes in stockholders' equity, and cash flow of the Acquired Companies as at the respective dates of and for the periods referred to in such financial statements in all material respects and (2) were prepared in accordance with GAAP, subject, in the case of the interim financial statements, to normal recurring year-end adjustments (the effect of which will not, individually or in the aggregate, be materially adverse) and the absence of notes (that, if presented, would not differ materially from those included in the Balance Sheet); the financial statements referred to in this Section 3.4 reflect the consistent application of such accounting principles throughout the periods involved.

(ECF 117 at 28.)  The contract defined GAAP as "generally accepted United States accounting principles, applied on a basis consistent with the basis on which the . . . financial statements referred to in <u>Section 3.4</u> were prepared."  (<u>Id.</u> at 11.)

In the fourth quarter of 2011, Plaintiff's calculations reflected that Actual Profit Margins were greater than the Estimated Profit Margins.  (ECF 101, ¶60.)  However, as of November 14, 2012 (and inclusion of a reported loss of $3,799,154 on the Cadre Project), the Estimated Profit Margins were greater than the Actual Profit Margins.  (<u>Id.</u>, ¶¶61-62.)  Moreover, as of November of 2011, consolidated financial statements indicated a 2011 EBITDA in excess of $8 million. (<u>Id.</u>, ¶66.)  However, on April 30, 2012, Plaintiff delivered the 2011 income report, which reflected a 2011 EBITDA of less than $6 million.  (<u>Id.</u>, ¶67.)

## 2.    The Cadre Project[5]

The parties agree that the represented estimated profit margin for the Cadre Project as of September 30, 2010 was 22.4%.  (ECF 115, ¶22; Defendants' Joint Response to Plaintiff's Statement of Additional Material Facts in Response to Defendants' Joint Motion for Summary Judgment, ECF 168, ¶22.)  The parties also agree that revenue and profits for the Cadre Project were booked using the cost-to-cost method of percentage completion accounting.[6]  (ECF 101,

---

[5]  Plaintiff states that "the damages suffered by Plaintiff arise primarily out of Defendants' overstatement of the estimated profit margin on the Cadre Project and Defendants' consequent improper booking of profit in 2010." (Plaintiff's Memorandum in Opposition to Defendant's Joint Motion for Summary Judgment, ECF 113 at 4.) Accordingly, the Court, for purposes of this motion, will focus its attention on the issues related to the Cadre Project.

[6]  The parties, however, dispute the proper characterization of the cost-to-cost method of percentage of completion accounting.  Defendants state that for such a method, "the total estimated costs to complete a project is used to determine expected profit, by subtracting the estimated costs from the expected total revenues."  (ECF 101, ¶25.) Plaintiff, on the other hand, states such a characterization is incomplete and under the cost-to-cost method:

> [T]he contractor performs periodic calculations of progress toward project completion.  Such calculations form the basis for the recognition of contract revenues, costs, and profit.  To measure progress toward completion, and thus the percentage-of-completion at any point, one divides total costs incurred as of the measurement date by the total estimated contract costs.  The resulting quotient, expressed as a percentage, is used to calculate and recognize earned revenues and profit. At each measurement period, revenues and profit are recognized in proportion to the costs incurred.

¶24; Plaintiff's Responses to Defendants' Joint Statement of Uncontroverted Material Facts in Support of Summary Judgment, ECF 114, ¶24.)  Plaintiff, however, asserts that Defendants improperly overstated the Cadre Project estimated profit margin.  (Plaintiff's Memorandum in Opposition to Defendants' Joint Motion for Summary Judgment, ECF 113 at 4, 7.)  To support this assertion, Plaintiff relies on the expert opinion of Matthew Bialecki, a forensic CPA hired by Plaintiff to examine this case.  In his expert report, Mr. Bialecki distinguishes between what he terms USA Tank's "Accounting Estimates," which he defines as project cost estimates used by the accounting function, and what he calls USA Tank's "Project Management Estimates," which he defines as project cost estimates used by the project management function.  (Amended Expert Report of Matthew G. Bialecki, CPA, CFF, CGMA, ECF 162 at 19.)  He states that "[t]he Company's accounting function, despite being in communication with project management and aware of project management cost estimates, used independent cost estimates that result[ed] in materially greater project revenues and profits than the estimates utilized by the Company's project management function."  (Id.)  He opines that "[t]he Company's use of one calculation for accounting purposes and another calculation for project management purposes has no basis in GAAP, which specifically requires the opposite, by requiring accounting and project management personnel to share information so that the most accurate cost estimate is used for accounting purposes."  (Id. at 32.)

With specific regard to the Cadre Project, Mr. Bialecki opines that the "Cadre contract" contained "inconsistencies and errors representing misapplications of GAAP and misuse of facts that existed during the course of the project," and that the "profit margin percentages [were] inaccurate and incomplete" because such percentages "(i) disregard[ed] contemporaneous cost

---

(Plaintiff's Responses to Defendants' Joint Statement of Uncontroverted Material Facts in Support of Summary Judgment, ECF 114, ¶25.)

estimates prepared and used by project managers and project consultants; and (ii) d[id] not

consider costs for all elements of the project." (Id. at 18.)  Mr. Bialecki further opines that,

although the September 30, 2010 Accounting Estimate stated $16,022,521 in costs, $18,854,218

in costs had been incurred or should have been estimated by USA Tank to complete the Cadre

Project.  (Id. at 26; see also ECF 168, ¶39.)  Mr. Bialecki suggests that the September 29, 2010

Project Management Estimate, sent from Defendant S. Slinkard to Defendant C. Slinkard on

October 5, 2010, "represents a more complete and accurate cost estimate of all components of

the Cadre contract, which, in accordance with GAAP, should have also been used for accounting

and financial reporting purposes." (ECF 162 at 30-31.) Mr. Bialecki concludes his report as

follows:

> [T]he Seller Parties' accounting for the Cadre contract did not conform to GAAP.
> This departure from GAAP overstated profit and EBITDA by $2,942,258 in the
> September 30, 2010 financial statements that the Seller Parties had represented
> and warranted were prepared in accordance with GAAP in SPA § 3.4. . . .

(Id. at 44.)

Defendants dispute that Mr. Bialecki's analysis supports his conclusion that there was

some error or misrepresentation in the financial disclosures for the Cadre Project.  In this regard,

Defendants suggest that he incorrectly assumes that Defendants relied on the Accounting

Estimate to estimate costs for the Cadre Project.  (Defendants' Joint Memorandum in Support of

Their Joint Motion for Summary Judgment, ECF 74 at 10.) Defendants refer to the May 10, 2013

deposition of Defendant C. Slinkard, at which he testified another document, ECF 86, was used

to examine cost estimates for the Cadre Project.[7]  (May 10, 2013 Deposition of Christopher

---

[7] Plaintiff argues that ECF 86 lacks proper authenticity and foundation because David Arnold, Plaintiff's CFO, averred that it was not on Plaintiff's computers, servers, emails, in hard copy format, or in any other format prior to being produced in this litigation.  (Declaration of David Arnold, ECF 137 at 1-2.)  Further, Plaintiff argues that ECF 86 is irrelevant because Brian Lovett, Plaintiff's Executive Vice President, averred that ECF 86 was not provided to Plaintiff during the due diligence process, prior to the closing of the transaction, or during Defendant C. Slinkard's

Slinkard, ECF 141 at 11.)  Defendant C. Slinkard, a CPA, testified that, based on the information available to him at the time, he believed that he followed GAAP in preparing the total cost estimate for the Cadre Project as of September 30, 2010.  (Id. at 2, 34.)  Further, Mr. Bialecki testified that he agrees that ECF 86 appeared to have a "breakdown where it is done by scope of work," a "listing of vendors who was going to be accomplishing that scope of work listed next to the scope of work," and a "proposal amount or the budget amount on the project management estimate," which are some of the deficiencies that he suggests caused the Accounting Estimate to fail to conform to GAAP.  (Mar. 15, 2013 Deposition of Matthew Bialecki, ECF 139 at 38.)  Mr. Bialecki also testified that, if the people involved with preparing the accounting estimate for the Cadre Project said they used ECF 86, he would not have any reason to believe that the information contained in ECF 86 was not used.  (Id.)  However, Mr. Bialecki noted that ECF 86 contained information that he believed at that time to be incorrectly stated.  (Id. at 38-39.)

Defendants also contend that the Accounting Estimate was a budget versus actual comparison that had been provided in the form and format requested by McGladrey.  (ECF 74 at 11.)  Tammy Hill, the Corporate Representative of McGladrey, testified that the Accounting Estimate was in a format typically requested by McGladrey, and further that McGladrey did not request that Defendants provide the actual costs, estimated budget, or gross profit margin for the Cadre Project in a different format than the Accounting Estimate.  (May 8, 2013 Deposition of Tammy Hill, ECF 126 at 11-12.)

### 3.    Damages

Plaintiff states that the September 13, 2010 PowerPoint presentation indicated a profit margin of 23% for the Cadre Project.  (EFC 123.)  Further, Brian Lovett, Executive Vice

---

employment with Plaintiff.  (Declaration of Brian Lovett, ECF 122 at 3.)  The Court herein finds that a material factual issue exists which precludes summary judgment, and at this time it will decline to address further Plaintiff's concerns with ECF 86.

President of Tank Holdings, Inc., averred that the September 13, 2010 PowerPoint presentation represented that $2,107,047 of USA Tank's total 2010 projected EBITDA of $4,716,456 for non-turnkey business was attributable to the Cadre Project.  (Declaration of Brian Lovett, ECF 122 at 2.)  Mr. Lovett also averred that Plaintiff relied on the representations made in the September 13, 2010 PowerPoint presentation and the estimated profit margin of the Cadre Project in determining the subsequent September 15, 2010 purchase offer.  (Id. at 3.)  Mr. Lovett averred that Plaintiff's purchase price was calculated as a multiple of EBITDA, and "[h]ad Defendants revealed the true estimated profit margin on the Cadre Project and its impact on . . . financial position, [Plaintiff] either would not have completed the transaction or it would have significantly lowered the purchase price that it was willing to pay."  (Id. at 4.)

Gary Frantzen is a chartered financial analyst who was hired by Plaintiff to examine this case.  Mr. Frantzen opines that "4.2x," which was "the multiple of EBITDA applied" to determine the purchase price if EBITDA was $5.668 million and the purchase price was $24 million, was "a reasonable multiple reflecting" the fair market value of USA Tank.  (Amended Expert Report of Gary T. Frantzen, CFA, ECF 160 at 8, 39.)  In this regard, he states that, assuming there was no departure from GAAP, $24 million would have been a reasonable representation of fair market value for USA Tank.  (Id. at 37.)  However, Mr. Frantzen further opines that a departure from GAAP (as asserted by Plaintiff) resulted in a "$2.942 million correction" such that the "EBITDA was actually $2.726 million."  (Id. at 40.)  This "correction" resulted in reduction of the fair market value "of the Company . . . to approximately $11.447 million."  (Id.)  That is, according to Mr. Frantzen, the alleged departure from GAAP "had a negative impact of $12.553 million to the Buyer as measured by the difference in the [fair market

- 12 -

value] of the [total invested capital] of the Company resulting from the correction" of such a departure from GAAP.  (Id. at 8-9.)

Defendants, however, dispute that Plaintiff's evaluation of a purchase price for USA Tank included consideration of turnkey work.  On March 23, 2010, Defendants provided Plaintiff with information that was represented to be 2010 financial projections adjusted to exclude turnkey work from projects such as the Cadre Project.  (ECF 114, ¶50.)  Mr. Lovett sent an email on March 31, 2010 in which he stated it was his position Plaintiff could "only pay a multiple of the 'recurring' and maybe $ for $ (1x) for turnkey."  (ECF 87 at 1.)  Plaintiff used model scenarios in evaluating its purchase price of USA Tank, including a risk adjusted approach where it was assumed that USA Tank had no turnkey work.[8]  (ECF 114, ¶54.)  In a November 9, 2011 email sent by Mr. Lovett, he stated that "our valuation approach when we acquired the business assumed a risk adjusted approach where the business had no turn-key work, only base tank erection business."  (ECF 89 at 1 (emphasis added).)

Defendants also dispute that the September 13, 2010 PowerPoint as submitted by Plaintiff is an accurate representation of what was presented.  Stephen Lightstone, a Managing Director at CC Capital Advisors (the representative of the Bell Defendants during the sale of USA Tank), testified that he sent "a lot of information . . . based on data [they] pulled," but that the September 13, 2010 PowerPoint did not "look like a package [he] remember[ed] at all."  (Mar. 4, 2013 Deposition of Stephen A. Lightstone, ECF 124 at 18.)

**C.    Discussion**

Defendants set forth four arguments in support of their motion for summary judgment. First, Defendants argue that Plaintiff has not provided an opinion or any credible evidence to

---

[8] At his deposition, Mr. Lovett testified that multiple models were utilized by Plaintiff to determine the purchase price for USA Tank, one of which was a risk adjusted model.  (Apr. 5, 2013 Deposition of Brian Lovett, ECF 118 at 20.)  Mr. Lovett testified Plaintiff also used an investor model and a management projection model.  (Id.)

support its assertion that Defendants knowingly overstated the estimated profit margin and understated estimated costs for the Cadre Project in violation of GAAP.  Second, Defendants state that Plaintiff has not submitted sufficient evidence of damages.  Defendants argue that Plaintiff did not consider projects such as the Cadre Project when determining its purchase offer, and further contend that the parties' agreement addressed the possibility of cost overruns and under-realization of expected profits.  Defendants argue that Plaintiff has availed itself to this contractual remedy in a contemporaneous arbitration, and that it will be made whole in that proceeding to the extent any claimed loss actually exists.  Third, with regard to Plaintiff's fraud counts, Defendants argue that Plaintiff's own expert does not opine that Defendants committed fraud, and Plaintiff's evidence on the issue is legally insufficient to survive summary judgment. Finally, Defendants argue that the claim for common law fraud fails because it is a restatement of Plaintiff's claim for breach of contract.

Plaintiff opposes Defendants' motion for summary judgment in all respects.  Plaintiff argues that, while Defendants attack the information Mr. Bialecki utilized to form his opinion, they do not deny the existence of his opinion itself.  Plaintiff argues that summary judgment is improper because such an issue is a question of credibility for a jury to resolve, not a question of admissibility for the Court.  Plaintiff also argues that it did consider the Cadre Project when determining the purchase price, and that it was damaged in a manner not contemplated by the parties' agreement.  In this regard, Plaintiff argues that Defendants' actions caused it to pay an inflated purchase price, a damage that cannot be remedied by a contract provision intended to be a dollar-for-dollar adjustment to working capital.  Finally, Plaintiff argues that fraud claims are rarely properly resolved on summary judgment because the facts of such claims are almost

always proven by circumstantial evidence, and that it is not precluded from bringing a claim for fraud simply because it also asserts a breach of contract action.

### 1.    Sufficiency of Expert Testimony

Federal Rule of Evidence 702 governs the admissibility of expert testimony.  It provides as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  Pursuant to this rule, a district court acts as a gatekeeper "to ensure that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." Russell v. Whirlpool Corp., 702 F.3d 450, 456 (8th Cir. 2012) (quotation omitted).  Further, a court is entitled to substantial discretion in determining whether expert testimony should be allowed. Id. "There is no single requirement for admissibility as long as the proffer indicates that the expert evidence is reliable and relevant."  Id. at 456-57 (quotation omitted).  When evaluating the sufficiency of expert testimony, "the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination.  Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded." Minn. Supply Co. v. Raymond Corp., 472 F.3d 524, 544 (8th Cir. 2006) (quotation omitted).

Defendants do not argue that Mr. Bialecki is generally unqualified to offer an opinion about GAAP; rather, Defendants argue that Mr. Bialecki's expert opinion is based on the wrong document and should therefore be disregarded.  However, the September 30, 2010 Accounting

Estimate utilized by Mr. Bialecki to form his opinion is not without support in the record. Indeed, there are several disputed facts concerning the purpose of this Accounting Estimate, as well as what document was used by Defendants to examine cost estimates for the Cadre Project. Further, Mr. Bialecki clearly opines that the financial information provided by Defendants to Plaintiff contained misapplications of GAAP and misuse of facts.  There does not appear to be any contention that such an opinion, if true, would fail to lend support to Plaintiff's claims that stem from Defendants' alleged failure to provide Plaintiff with certain financial documents in a contractually sufficient manner.  The Court finds for purposes of this motion that Defendants' objection goes to the factual basis for Mr. Bialecki's opinion and therefore requires determination of issues of fact and credibility that are within the province of a jury. Accordingly, the Court will deny the motion for summary judgment in this regard.

### 2.    Evidence of Damages

The parties agree that Plaintiff must produce evidence of damages to maintain its claims. Defendants argue that there is no evidence in the record that Plaintiff has or will suffer damages. Defendants advance two theories to support this argument, each of which is considered below.

### a.    The Cadre Project and the Purchase Price

To recover for a claim of breach of contract under Missouri law, a claimant must set forth evidence that it "was damaged as a consequence of that breach."  Timberland Forest Prods., Inc. v. Franks, -- S.W.3d --, 2013 WL 941828, at *4 (Mo. Ct. App. 2013) (citation omitted); see also id. ("[T]o prevail on its claim for breach of contract, [the plaintiff] had the burden to prove that Defendants' breach of the settlement agreement actually caused it some damage.").  Plaintiff's other causes of action similarly require evidence of causation connecting the alleged misstatements to the damage claimed.  See, e.g., McAdams v. McCord, 584 F.3d 1111, 1114 (8th

Cir. 2009) (stating that, with regard to loss causation for a Rule 10b-5 claims, a plaintiff must show "a causal connection between the defendant's misstatements and the plaintiff's losses"); Pelster v. Ray, 987 F.2d 514, 524 (8th Cir. 1993) (finding that Missouri law "requires that a plaintiff show . . . that the defendant's conduct constituted a substantial factor in producing the plaintiff's injury"). Furthermore, because it would be "plainly unjust for a trier of fact to compel a party to pay damages for something that may or may not have resulted" from its actions, a damage claim must be based on more than "a gossamer web of shimmering speculation and finely-spun theory." Delgado v. Mitchell, 55 S.W.3d 508, 512 (Mo. Ct. App. 2001) (quotation omitted). Accordingly, Plaintiff must submit some evidence both as to causation and damages to avoid summary judgment.

Defendants argue that the evidence shows that Plaintiff excluded the value of turnkey work, such as the Cadre Project, when determining its offer for USA Tank. It stands to reason, Defendants argue, that any misstatement regarding turnkey projections therefore had no effect on the amount that Plaintiff would have paid for USA Tank. The Court, however, finds sufficient factual support in the record for Plaintiff to maintain its claims. Plaintiff offers the September 30, 2010 Accounting Estimate and the September 13, 2010 PowerPoint presentation as evidence that Defendants represented to Plaintiff that the profit margin for the Cadre Project was 22.4% or 23%. Mr. Bialecki provides the opinion that such profit margin percentages were inaccurate and were based on financials that did not satisfy GAAP. Mr. Lovett offers averments and testimony that Plaintiff considered such profit margins when valuing USA Tank. Mr. Frantzen offers an opinion that the departure from GAAP resulted in a $12.553 million overpayment by Plaintiff for USA Tank. Although conflicting evidence exists in the record that may create doubt regarding such evidence, viewing the facts in a light most favorable to Plaintiff the Court finds ample

evidence in the record to support Plaintiff's theories of both causation and valuation of damages. Accordingly, the Court will deny the motion for summary judgment in this regard.

      **b.**    **Contractual Remedies**

It is well established that a party is "not allowed to be made more than whole or receive more than one full recovery for the same harm." <u>Horizon Mem'l Group, L.L.C. v. Bailey</u>, 280 S.W.3d 657, 666 (Mo. Ct. App. 2009) (citation omitted). However, "a single transaction may invade more than one right," and an injured party may seek recovery on more than one theory. <u>Id</u>. Moreover, the parties to a contract may agree to limit the remedies available to those specified in the contract. However, if a contract specifies a particular remedy, such a remedy "'is to be considered permissive rather than exclusive, unless so provided in the contract either expressly or by necessary implication.'" <u>Damon Pursell Constr. Co. v. Mo. Highway & Transp. Comm'n</u>, 192 S.W.3d 461, 479 (Mo. Ct. App. 2006) (quoting <u>Graves v. Estate of Grebe</u>, 613 S.W.2d 148, 150 (Mo. Ct. App. 1981)).

Defendants argue that the evidence shows that the SPA included mechanisms for adjusting the contract consideration in the event that the final profit margin or EBITDA for a project such as the Cadre Project was less than what had been estimated at closing. Defendants point to SPA § 2.7, which provides for a dollar-for-dollar reimbursement payment for the Actual Profit Margin and Estimated Profit Margin difference, and § 2.8, which provides for an EBITDA Earn-Out payment. Defendants suggest that the fluctuations from such payments in Defendants' favor (without considering the Cadre Project profit margin and EBITDA) to payments in Plaintiff's favor (after inclusion of the Cadre Project profit margin and EBITDA) demonstrate that the contract already provided a means to recover unexpected losses associated with the

Cadre Project.  Defendants, in effect, argue that these contractual remedies are the exclusive remedy for Plaintiff and Plaintiff should not be allowed to maintain any of its causes of action.

However, Defendants do not pinpoint, and the Court does not see, an express or necessarily implicit basis in the SPA that limited Plaintiff's remedies in the way Defendants suggest.  Had the parties intended to draft a contract that so limited Plaintiff's remedies, they could have done so.  Further, the contractual damages Plaintiff seeks in arbitration, which are to compensate Plaintiff in the event unexpected business conditions lowered the estimated project profit margins or the estimated EBITDA, are separate and distinct from the damages it seeks in this action, which are to compensate Plaintiff for Defendants' alleged breach, misrepresentations, and fraud.  Although the damages recoverable from one theory may well overlap with the damages from another, if certain damages are proven to an arbitrator's satisfaction and certain damages are proven to a jury's satisfaction, the Court and the parties can develop instructions which will avoid a double recovery.  See United Indus. Syndicate, Inc. v. Auto Supply Co., 686 F.2d 1312, 1317 n.6 (8th Cir. 1982).  The possibility of double recovery does not preclude Plaintiff's action in its entirety.  Accordingly, the Court will deny the motion for summary judgment in this regard.

### 3.    Evidence of Fraud

To prevail on a claim brought pursuant to Rule 10b-5, a claimant must sufficiently show, among other elements, scienter (i.e., a wrongful state of mind).  Minneapolis Firefighters' Relief Ass'n v. MEMC Elec. Materials, Inc., 641 F.3d 1023, 1028 (8th Cir. 2011).  Scienter requires a showing of "reckless or intentional wrongdoing."  Elam v. Neidorff, 544 F.3d 921, 928 (8th Cir. 2008) (quotation omitted).  Evidence that "a defendant made materially misleading statements, while in possession of conflicting information, support a strong inference of scienter."  Id. at

929.  Scienter "may be implied in certain situations or established by circumstantial evidence."

In re Alodex Corp. Sec. Litig., 533 F.2d 372, 374 (8th Cir. 1976) (citation omitted).  Missouri

case law similarly recognizes the role circumstantial evidence plays in proving fraudulent intent.

See Birdsong v. Christians, 6 S.W.3d 218, 225 (Mo. Ct. App. 1999) ("There need not be an

affirmative representation for actionable fraud to exist: if a party has a duty to speak, silence can

amount to misrepresentation.  Furthermore, proof of a party's knowledge is similar to proof of

such elusive facts as intent, motive, undue influence, mental capacity, and the like. Summary

judgment is rarely appropriate in these types of cases in which facts must in nearly every case be

proven by circumstantial evidence." (internal quotations and alterations omitted)).

Defendants challenge the sufficiency of the evidence of scienter or fraudulent intent in

this case.  However, viewing the evidence in a light most favorable to Plaintiff, the Court finds

that genuine issues of material fact exist regarding scienter or fraudulent intent that preclude

summary judgment.  The parties dispute the accuracy of certain exhibits, including the

September 13, 2010 PowerPoint.  Plaintiff has presented evidence that Defendants prepared cost

estimates that reflected higher costs than were presented to Plaintiff.  Further, there is evidence

that Defendants knew or should have known that there were costs not included in the Cadre

Project cost estimate.  These issues require factual and credibility determinations that are clearly

for a jury to decide.  Accordingly, the Court will deny the motion for summary judgment in this

regard.

### 4.      Fraud and Breach of Contract

Under Missouri law, "[a] mere failure to perform a contract cannot serve as the basis of

tort liability unless the breach is also an independent tort."  Haugland v. Parsons, 863 S.W.2d

609, 611 (Mo. Ct. App. 1992) (evaluating breach of contract and emotional distress claims).

Specifically, a claim of fraud "is permitted only if it arises from acts that are separate and distinct from the contract." O'Neal v. Stifel, Nicolaus & Co., 996 S.W.2d 700, 702 (Mo. Ct. App. 1999) (citation omitted).  Nevertheless, "fraud in the negotiation of [a] . . .  contract can amount to a separate cause of action for fraud under Missouri law." Id.  "A party who fraudulently induces another to contract and then also refuses to perform the contract commits two separate wrongs, so that the same transaction gives rise to distinct claims that may be pursued to satisfaction consecutively." Trimble v. Pranca, 167 S.W.3d 706, 711 (Mo. 2005) (citation omitted); see also id. (stating that a plaintiff could sue a defendant "for breach of the bargain damages resulting from fraud in inducing her to contract and also recover additional damages, if any, resulting from breach of contract, as both rest on affirmance of the contract"); cf. Semi-Materials Co. v. MEMC Elec. Materials, Inc., No. 4:06CV1426FRB, 2011 WL 65919, *2 (E.D. Mo. Jan. 10, 2011) ("To the extent defendants argue that plaintiff cannot sustain its fraud claim on account of its failure to provide evidence of damages other than that submitted on its claim of breach of contract, defendants' argument is misplaced. To recover on a claim for fraud, a party need not prove damages separate from those sustained as a result of a breach of contract.").

Defendants argue that Plaintiff's fraud claim fails because it is a restatement of the breach of contract claim.  The Court agrees that Missouri law supports Defendants' position that any claim of fraud must stem from acts that are separate and distinct from the parties' contract to be actionable. However, for purposes of this motion, the Court finds sufficient allegations and evidence to support both causes of action.  That is, evidence that Defendants fraudulently induced Plaintiff to sign the SPA may support a fraud action while evidence that Defendants breached an obligation set forth in the SPA may support a breach of contract action. Accordingly, the Court will at deny the motion for summary judgment in this regard.

## III. MOTION TO STAY PENDING ARBITRATION

**A.     Standard of Review**

The Federal Arbitration Act "requires a district court to issue a stay if an issue in the case is 'referable' to arbitration." Reid v. Doe Run Resources Corp., 701 F.3d 840, 845 (8th Cir. 2012) (citation omitted).  "There is strong policy favoring arbitration, and doubts are resolved in favor of arbitration." Id. (citations omitted).  "A dispute must be submitted to arbitration if there is a valid agreement to arbitrate and the dispute falls within the scope of that agreement." Bank of Am. v. UMB Fin. Servs., Inc., 618 F.3d 906, 911 (8th Cir. 2010) (citations omitted). Nevertheless, "[a] party who has not agreed to arbitrate a dispute cannot be forced to do so." Id. (citation omitted).

**B.     The Bell Defendants' Counterclaim**

The Bell Defendants' Counterclaim contains claims for breach of contract (Count I), injunctive relief (Count II), and declaratory judgment (Count III).  As bases for Count I, the Bell Defendants allege in ¶71 that Plaintiff failed to, "as required by Section 2.8" of the SPA,[9] conduct the business of USA Tank in good faith and continue to operate the business of USA Tank in the ordinary course of business by:

> a.     Failing to pay sub-contractors, suppliers, vendors, and other creditors of the company amounts owed at the time they were owed, resulting in the inability of [Plaintiff] and [USA Tank] to hire sub-contractors and purchase materials necessary to continue operating the business in such a way as it would be able to timely and professionally complete jobs and/or acquire new jobs;
>
> b.     Failing to enforce contractual provisions against customers and subcontractors that would result in [Plaintiff] and [USA Tank] receiving additional profits on the existing projects;

---

[9] As stated above, § 2.7 and § 2.8 of the SPA concerned a post-closing final base purchase price adjustment and an Earn-Out payment, respectively.

- 22 -

c.      Paying commissions and/or bonuses to sub-contractors, vendors, salespersons and/or other employees in excess of what was earned by that person or entity;

d.      Withdrawing amounts from the company in excess of what was previously done in the [o]rdinary [c]ourse of [b]usiness for [USA Tank] prior to [its] sale; and

e.      Calculating EBITDA in a manner inconsistent with SPA/GAAP, as that term is defined in the [SPA].

(ECF 22, ¶71.)  Further, in ¶72, the Bell Defendants allege that Plaintiff breached its duties under

the SPA "through the previously described actions," including:

a.      Failing to provide the [EBITDA calculations for the 2011 fiscal year] related documents and access to those [EBITDA calculations for the 2011 fiscal year] related individuals specified in the [SPA];

b.      Unilaterally declaring that it would not submit any [EBITDA calculations for the 2011 fiscal year] related disputes to an arbitrator, and subsequently refusing to re-confirm its obligation to do so;

c.      Failing to provide the tax and accounting documents required under Section 7.1 of the [SPA];

d.      Failing and refusing to allow the [Bell Defendants] to assume the defense of the [lawsuit filed by the Slinkard Defendants against USA Tank on February 22, 2012[10]], as requested;

e.      Making bad faith claims against the [amount placed into escrow pursuant to an escrow agreement[11]] in excess of $14,500,000.00; and

f.      Making unwarranted adjustments to the [calculation of the variance between estimated profit margin percentage and final profit margin percentage required by the SPA].

(Id., ¶72.)

---

[10]  The Bell Defendants allege that Plaintiff terminated the employment of the Slinkard Defendants, and that the Slinkard Defendants thereafter filed an action against USA Tank for severance amounts and bonus amounts they claimed to be owed.  (ECF 22, ¶¶47-48.)

[11]  The Bell Defendants allege that they were obligated to deposit a certain amount into an escrow account.  (ECF 22, ¶36.)  The Bell Defendants further allege that, pursuant to § 5.7 of the SPA, Plaintiff had a right to seek a set-off from the escrow account any amounts for which, pursuant to § 5.2, it was entitled to indemnification.  (Id., ¶¶32, 35.)  However, the Bell Defendants allege that Plaintiff had to provide notice of any action that may result in its seeking of indemnification, and further that the Bell Defendants had a right to assume the defense of such action as long as the Bell Defendants were not parties thereto.  (Id., ¶¶33-34.)

In Count II, the Bell Defendants allege that Plaintiff "is in breach of the [SPA] by failing and refusing to provide all of the documents and access to the individuals associated with" the EBITDA calculations for the 2011 fiscal year, "as required by Sections 2.7 and 2.8 of the [SPA]." (Id., ¶85.)   The Bell Defendants seek an injunction requiring Plaintiff to produce records and make available all employees needed to prepare the EBITDA calculations for the 2011 fiscal year.  (Id., ¶88.)

Finally, in Count III, the Bell Defendants seek declaratory judgment regarding an amount placed into escrow and a separate lawsuit filed by the Slinkard Defendants against Plaintiff. Specifically, the Bell Defendants seek "[a] judgment declaring that [the Bell Defendants] are not required to indemnify [Plaintiff] for any amounts" relating to the lawsuit filed by the Slinkard Defendants (because of Plaintiff's "refusal to permit the [Bell Defendants] to assume defense of that action"), as well as "[a] judgment declaring that the [Bell Defendants] are entitled to receive the entire" amount placed into escrow and directing the agent for the escrow account to disperse those funds accordingly.  (Id., ¶98.)

## C.    Discussion

Pursuant to § 2.7 (D) and § 2.8(D)[12] of the SPA, the parties agreed to submit to an "Independent Dispute Arbitrator" disputes arising out of such sections.  (ECF 117 at 22-25.) Indeed, the Bell Defendants now agree that some disputes reflected in Count I of the Counterclaim should be stayed pending the contemporaneous arbitration.  (ECF 106 at 1-3.) Accordingly, Plaintiff's motion is granted to the extent is seeks a stay of Count I for the following bases: calculating EBITDA in a manner inconsistent with SPA/GAAP; failing to provide documents and access to individuals needed to make EBITDA calculations for the 2011

---

[12] Section 2.8(D) referred to the resolution of such issues by an Independent Dispute Arbitrator as set forth in § "2.7(C)," although this appears to be a typographical error.  (ECF 117 at 25.)

fiscal year; unilaterally declaring that it would not submit any EBITDA calculations related disputes to an arbitrator; and making unwarranted adjustments to § 2.7 calculations.

Further, to the extent not specifically agreed to by the Bell Defendants, the Court finds that the remaining allegations of breach contained in ¶71 of the Counterclaim that serve as bases for Count I, as well as the entirety of Count II, are explicitly grounded in § 2.7 or § 2.8 of the SPA. Accordingly, the Court will grant Plaintiff's motion to the extent it seeks a stay of the whole of Count II, as well as the following aspects of Count I: failing to pay sub-contractors, suppliers, vendors, and other creditors of the company amounts owed at the time they were owed; failing to enforce contractual provisions against customers and subcontractors; paying commissions and/or bonuses to sub-contractors, vendors, salespersons, and/or other employees in excess of what was earned by that person or entity; and withdrawing amounts from the company in excess of what was previously done in the ordinary course of business for USA Tank prior to its sale.

Count III concerns the General Escrow Agreement. The General Escrow Agreement required the establishment of an immediately available escrow account from which Plaintiff could make claims pursuant to § 5.2 of the SPA. (General Escrow Agreement, ECF 111 at 1.) Section 5.2 of the SPA allowed claims to be made for, among other reasons, "any [b]reach of any representation or warranty made by" the Bell Defendants. (ECF 117 at 60.) The General Escrow Agreement did not itself include an express arbitration clause.[13] Nevertheless, the Court finds that the General Escrow Agreement's reference to § 5.2 of the SPA may, in part, implicate

---

[13] Although stating that the disbursement of escrow funds will be pursuant to the direction of a court or an arbitrator, the General Escrow Agreement did not require any matters to be arbitrated. (ECF 111 at 2.) Rather, the General Escrow Agreement contained a statement that "each party agrees that any legal proceedings based hereon or arising out of, under, or in connection with, this agreement or any course of conduct, course of dealing, statements or actions of the parties hereto shall be brought and maintained exclusively in the Circuit Court of St. Louis County, Missouri, or in the United States District Court for the Eastern District of Missouri, Eastern Division, located in St. Louis, Missouri." (Id. at 5.)

the matters to be submitted to the arbitrator and may therefore affect disbursement of the escrow account.  The Court will not consider, at this time, a claim for disbursement of funds that may be, at least in part, the subject of a future order of an arbitrator.  Accordingly, the Court will grant Plaintiff's motion to the extent it seeks a stay of Count III.

However, the Court agrees with the Bell Defendants that parts of Count I (specifically, those bases contained in ¶72 (c), (d), and (e)) concern matters outside of the arbitration clauses contained in § 2.7 and § 2.8 of the SPA.  The Bell Defendants cannot be required to arbitrate disputes they did not agree to arbitrate.  Accordingly, the Court will deny Plaintiff's motion to the extent it seeks a stay of the following aspects of Count I: failing to provide the tax and accounting documents required under § 7.1 of the SPA; failing and refusing to allow the Bell Defendants to assume the defense of the lawsuit filed by the Slinkard Defendants against USA Tank on February 22, 2012; and making bad faith claims against the amount placed into escrow pursuant to the General Escrow Agreement.

## IV. CONCLUSION

For the above stated reasons,

**IT IS HEREBY ORDERED** that:

1.      Plaintiff's Motion to Stay Counterclaim Pending Arbitration (ECF 68) is **DENIED** as to Count I to the extent such a count relies on the bases set forth in ¶72 (c), (d), and (e) of the Counterclaim, and **GRANTED** in all other respects; and

2.      Defendants' Joint Motion for Summary Judgment (ECF 73) is **DENIED**.

Dated this 22nd day of August, 2013.

_____

**JOHN A. ROSS**
**UNITED STATES DISTRICT JUDGE**

- 26 -